DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment entered by the Erie County Court of Common Pleas that convicted defendant-appellant Russell Fenwick of rape, sexual battery, gross sexual imposition, attempted rape, attempted sexual battery and intimidation, adjudicated him to be a sexual predator and sentenced him to a total of twenty-four years imprisonment. Appellant now raises the following assignments of error from that judgment:
"ASSIGNMENT OF ERROR NO. 1
 THE TRIAL COURT ERRED BY NOT PROPERLY APPLYING THE PROVISIONS OF R.C. § 2941.25 TO APPELLANT'S SENTENCE.
 "A. THE OFFENSES OF RAPE AND ATTEMPTED RAPE ARE ALLIED OFFENSES OF SIMILAR IMPORT WITHIN THE CONTEMPLATION OF R.C. 2941.25, AND THE SEPARATE CONVICTIONS VIOLATED APPELLANT'S CONSTITUTIONAL RIGHTS AGAINST DOUBLE JEOPARDY GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
 "B. THE TRIAL COURT ERRED WHEN IT IMPOSED `MERGED' SENTENCES ON COUNTS ONE AND THREE, AND COUNTS TWO AND FIVE AFTER FINDING THAT THE OFFENSES WERE ALLIED OFFENSES OF SIMILAR IMPORT BECAUSE THE CONVICTIONS ON THE LESSER COUNTS SHOULD HAVE BEEN VACATED WHEN IT SHOULD HAVE VACATED TWO OF THE CONVICTIONS PURSUANT TO R.C. § 2941.25.
"ASSIGNMENT OF ERROR II:
 RUSSELL FENWICK WAS DENIED HIS RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION AND THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN COUNSEL FAILED TO OBJECT TO THREE WITNESSES TESTIFYING AS TO THEIR CONCLUSIONS THAT MR. FENWICH [SIC] WAS GUILTY OF THE CHARGES IN QUESTION, THEREBY REMOVING THE ISSUE FROM THE JURY.
"ASSIGNMENT OF ERROR III:
 THE VERDICTS FINDING RUSSELL FENWICK GUILTY WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE BECAUSE THERE WAS NO SUBSTANTIAL EVIDENCE UPON WHICH A TRIER OF FACT COULD REASONABLY CONCLUDE THAT THE ELEMENTS OF THE OFFENSES HAD BEEN PROVEN BEYOND A REASONABLE DOUBT.
"ASSIGNMENT OF ERROR IV:
 THE CLASSIFICATION OF APPELLANT AS A SEXUAL PREDATOR PURSUANT TO R.C. § 2950 VIOLATES SECTION 1, ARTICLE 1 OF THE OHIO CONSTITUTION.
"ASSIGNMENT OF ERROR V:
 THE CLASSIFICATION OF APPELLANT AS A SEXUAL PREDATOR PURSUANT TO R.C. § 2950 CONSTITUTES DOUBLE JEOPARDY, IN VIOLATION OF OF [SIC] THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 1, § 10 OF THE OHIO CONSTITUTION."
On November 14, 1997, Russell Fenwick was indicted for the offenses of rape, in violation of R.C. 2907.02(A)(2), sexual battery, in violation of R.C. 2907.03(A)(9), and gross sexual imposition, in violation of R.C. 2907.05(A)(1). Subsequently, he was further indicted for the offenses of attempted rape, in violation of R.C. 2907.02(A)(2) and 2923.02(A), attempted sexual battery, in violation of R.C. 2907.03(A)(9) and 2923.02(A), and intimidation, in violation of R.C. 2921.04(B). The indictments arose out of the events of October 13, 1997. Those events were testified to at the trial below as follows.
In the summer of 1997, Russell Fenwick moved into the home of his then girlfriend, Maria Baker, and her four children: fifteen-year-old Michelle, fourteen-year-old Nicole, and their younger siblings Kristine and David. Fenwick soon became a father figure to Maria's children and Maria and he planned to marry. On the evening of October 13, 1997, at approximately 9:00 p.m., Fenwick drove Maria to her job, then drove back home after stopping along the way for beer. Michelle testified that when Fenwick returned home she was inside the house but soon thereafter went out to her mother's van and pretended she was driving. Appellant then came out to the van and told her to move over because he wanted to go to a drive-thru to buy beer. Michelle testified that during the drive, appellant told her that he was considering teaching her how to drive. Michelle then became very excited and begged appellant to teach her. After purchasing a twenty-two ounce beer at the drive-thru, appellant started driving out to the country. Eventually, appellant took Michelle to the Rest Haven Wildlife Area in Castalia, Ohio, where he exited the van and allowed her to drive in a parking lot for a while. Appellant then got back in the driver's seat and drove the van into an open field area. Michelle testified that appellant then stopped the van, put the blunt side of a knife to her throat, put his other hand around her neck and told her to get in the back of the van and remove her clothes. Michelle further stated that appellant told her that if she did not obey he would kill her. Michelle stated that she then climbed into the back of the van and removed her clothes. Michelle then faced the back of the van while appellant attempted to insert his penis into her vagina. Appellant, however, was unable to do so. Michelle stated that she then felt appellant's finger penetrate her vagina. After a moment, appellant stopped, said he could not continue and told Michelle to get dressed. Michelle testified that as they were leaving the park, appellant threw the beer bottle out of the van window. She further testified that on the way home, appellant apologized and allowed Michelle to drive. Appellant, however, further warned her that if she told anybody about what had occurred he would kill her and would "take your whole family down."
When appellant and Michelle returned home at around 1:30 a.m. Nicole noticed that Michelle's eyes were red and asked her if she was drunk or high. Michelle responded that she was not. Then she took a shower, smoked a bowl of marijuana, put her clothes in the washing machine and went to bed. She was not, however, able to sleep. The next morning, appellant drove Michelle and her siblings to school. At approximately 9:30 a.m., Michelle ran into her best friend, Charles Brown, at school and began to cry hysterically. Michelle then told him that she had been raped. Later that day, Brown took Michelle to the hospital after Michelle called the rape hotline. At the hospital, Dr. Edward Radatz examined Michelle and completed a rape kit.
Radatz testified at the trial below, by way of videotape, that he examined Michelle on the afternoon of October 14, 1997 after she had reported being raped. Radatz stated that initially, Michelle was crying but that soon she calmed down and Radatz was able to do a complete physical exam of her. He further stated that Michelle told him that appellant threatened her with a knife, that he tried to penetrate her vaginally with his penis, and that he did penetrate her vaginally with his finger. Upon examining Michelle, Radatz found no injuries to her genitalia and further found no injuries to her neck or other areas of her body. Radatz did state, however, that his medical findings were consistent with Michelle's story. Based on the history he obtained from Michelle, Radatz diagnosed her with acute sexual assault.
Also at the hospital, Michelle was interviewed by Detective Robert Lippert of the Erie County Sheriff's Office and Aaron Voltz of the Erie County Department of Children Services ("DCS). Lippert testified that on October 14, 1997, at approximately 12:00 noon, he received a call from the hospital reporting a rape. Because the victim was under eighteen years of age, caseworkers from the DCS had also been contacted. After Dr. Radatz completed his exam, Lippert, Voltz and Jennifer Rogers, also with the DCS, met with Michelle. Michelle told them the same story she testified to at the trial and further described the knife that appellant held to her throat. Subsequently, Lippert spoke with Charles Brown and learned that Michelle was consistent in her telling of the events of the night before. Thereafter, Lippert, Voltz and Rogers went to Michelle's home to speak with her mother, Maria Baker. Lippert testified that Baker and appellant were both at the home so Lippert asked to speak with Baker privately. After Lippert told Baker of Michelle's allegations, appellant came into the room and stated that Michelle was probably angry with him because he caught Michelle and Nicole smoking marijuana when he returned home from taking Baker to work. He then told Baker that he had planned to tell her about the marijuana incident later. Lippert then asked Baker if she had any kitchen knives that fit the description given to them by Michelle. Baker led the officer and DCS personnel into the kitchen after which appellant opened a drawer and handed three kitchen knives to the officers. Subsequently, Voltz showed the three knives to Michelle, who identified one as the knife that appellant used in the attack. Lippert then asked appellant to come to the police station for questioning.
Lippert's initial interview of appellant was tape recorded and the recording was played for the jury in the trial below. During the interview, appellant stated that when he returned home from taking Maria to work, he caught Michelle and Nicole smoking marijuana, argued with them about it and told them that he was going to tell Maria. Although he admitted drinking a twenty-two ounce beer when he got home, he denied ever leaving the house with Michelle afterward and denied having any sexual contact with her. He also stated that Michelle asked him to take her driving but he refused. Then, upon the suggestion of Lippert and in order to prove his innocence, appellant agreed to take a polygraph exam. Lippert then stated that the exam would be scheduled in a few days.
After the tape of Lippert's interview of appellant was played for the jury, Lippert was questioned about the interview in the trial below. Lippert stated that when appellant was directly questioned about the incident he cried. Lippert was further questioned about events subsequent to that interview. Initially, Lippert spoke with Maria Baker who told him that her van was rather dusty and that a piece of molding and been damaged inside the front seat passenger side of the van. Lippert testified that on October 15, 1997, he and Aaron Voltz took Michelle and Charles Brown to the Rest Haven Wildlife Area where she identified the area where she had been raped. Lippert also stated that as they entered the park and Michelle recognized a road and tower, she began to cry. A search of the heavy brush area surrounding the location identified by Michelle, however, did not reveal the beer bottle. Lippert testified that subsequently, he contacted a polygraph examiner, Chief Michael White of the Monroeville Police Department, and scheduled the exam for October 16, 1997. Chief White operates a private polygraph examination business aside from his duties as a police officer. Lippert stated that when appellant arrived for the exam, White took over and Lippert had limited contact with appellant. However, after appellant completed the initial forms but before he was to take the polygraph exam, White came out and told Lippert that appellant had made some admissions. White then handed Lippert a piece of paper on which appellant had made the following written statement:
 "I Russell Fenwick say that Michele [sic] Baker told me that if I let Her [sic] drive she would have sex with me [sic] we stopped the van [sic] she took her clothes off and said I could have sex with her [sic] I had been drinking and I attempted To [sic] have sex with her. My penis Never [sic] went in her only my finger might have went in her. She was trying to grab my penis [sic] She was the aggressor not me [sic] I am truly sorry that this night ever happened. I would like a second chance. If I choked her or harmed her in any way I did not mean to. My pants where [sic] down but I did not have an erection.
"I have read the above statement and it is true."
The statement is then signed by appellant. Based on this statement, Lippert interviewed appellant a second time. That interview was also tape recorded and that recording was also played for the jury in the trial below. In that interview, appellant made statements that were consistent with his written statement.
In addition to the above, Maria Baker and Michael White testified on behalf of the state. Baker stated that she bought a used van about one week before October 13, 1997 and that she had kept it very clean during that week. Consistent with Michelle and appellant's testimony, Baker stated that on the evening of October 13, appellant drove her to work and that he picked her up the next morning at approximately 7:40 a.m. Baked noticed that on the way home, appellant was very nervous and kept talking about how much gas the van used. When they got home, Baker also noticed that the exterior of the van was dirty and had mud on it. Baker then testified that at approximately 2:15 that afternoon, a police officer and a member of the Erie County Department of Children Services arrived at her home and informed her that appellant had raped her daughter. Finally, Baker stated that upon hearing the allegations, appellant sat down on the couch and cried. Baker testified that upon seeing appellant, she knew he had raped her daughter.
Michael White, the polygraph examiner testified that he is the Chief of Police in Monroeville but that he has a private business conducting polygraph exams. On October 16, 1997, he went to the Huron County Prosecutor's Office for the purpose of administering a polygraph exam on appellant. Initially, appellant read and signed a form indicating that he understood his Miranda
rights. White then began to explain the polygraph exam procedures to appellant when, White testified, appellant stated that he had previously lied to Detective Lippert. White then stated that appellant made admissions concerning the incident in question and then wrote out the statement quoted above. After appellant completed his written statement, White asked appellant to complete a standard "Exit Interview Form," which he did. That form included the following questions and answers:
 "Q7. `What did I say that finally convinced you to tell the truth?'
"Ans. Nothing I just want it over
"Q8. `Now that you have told me the truth, how do you feel?'
"Ans. Better
"* * *
"Q10. `Are you now sorry you committed that crime?'
"Ans. Yes."
In explaining appellant's answers to these questions, White testified that in his experience "* * * all guilty parties want the situation that they are involved with over with. It's a great burden, it's a stressful — it's a significant emotional event in their lives, so it makes good sense that they want it over with." On cross-examination, however, he also stated that innocent people want to be vindicated of their crimes.
At the conclusion of the state's case, appellant moved for an acquittal, which motion the court denied. Appellant then put on his case which consisted of testimony from his mother, brother, sister-in-law and himself. The testimony of appellant's family members mostly focused on their views of appellant's mental state after he was accused and their beliefs that appellant could not have committed the crimes with which he was charged.
In his testimony in the trial below, however, appellant gave a third story as to the events of October 13, 1997. Appellant explained that on that evening, after taking Maria to work, he stopped at a 7-Eleven store to purchase a twenty-two ounce beer. He then drove home, using the back roads because he did not have a valid driver's license. When he arrived home, he found Michelle and Nicole smoking marijuana and he chastised them for it. Appellant then testified that Michelle asked for the keys to the van so she could listen to the radio. Appellant gave her the keys and continued to watch a football game on television until approximately 12:00 midnight. He then went out to the van and told Michelle that he was going to get more beer. When Michelle asked if she could come along, appellant agreed. Appellant then testified that he drove to two carry-outs before finding one that was open, bought another twenty-two ounce beer, then drove around looking for a friend. Appellant testified that he stopped at several places, could not find the friend, and so he drove home. When they got home, appellant started watching television and Michelle took a shower. Appellant estimated that he then fell asleep at about 2:00 a.m. In explaining his previous statements to police, appellant stated that he lied in his first statement because he had been drinking and did not want to be charged with DUI and/or child endangering. He then testified that Mr. White told him what to write in his second statement and that he agreed to write the statement because he was told that he would not be charged with anything if he cooperated. He further stated that he feared if the police found out Michelle was lying they would put her in a detention home, and that he believed if he made the statement, it would keep Maria's name and his own family's name out of the newspapers. Finally, appellant testified that the police told him if he did not write the statement they would charge him with attempted murder. Upon questioning by his trial counsel and by the state, appellant denied in the trial below, ever molesting Michelle or having sexual contact with her.
At the conclusion of the trial, the jury found appellant guilty of all six offenses with which he was charged. Thereafter, the case proceeded to a hearing on sentencing and on whether appellant was a sexual predator under R.C. 2950.03. At the sexual predator hearing, Deborah Rife testified over the objection of appellant's counsel. Rife testified that on May 6, 1987, she was the victim of an aggravated assault committed by appellant. She further testified as to the circumstances of that assault. The court below then reviewed the factors under R.C. 2950.09, concluded that appellant was a sexual predator and explained appellant's obligations as a sexual predator. The court then proceeded to sentence appellant. Finding that appellant's convictions for rape (Count 1) and gross sexual imposition (Count 3) were allied, the court determined that for purposes of sentencing those convictions must merge. The court then sentenced appellant to nine years incarceration on the rape conviction. Finding further that appellant's convictions for sexual battery (Count 2) and attempted sexual battery (Count 5) were also allied, the court merged those convictions and sentenced appellant to four years incarceration on the sexual battery conviction. The court, however, maintained the convictions for gross sexual imposition and attempted sexual battery. The court then sentenced appellant to seven years incarceration on the attempted rape conviction (Count 4) and to four years incarceration on the intimidation conviction (Count 6). The court ordered that the sentences run consecutively, for a total of twenty-four years incarceration. It is from his conviction and sentence that appellant now appeals.
In his first assignment of error, appellant makes two separate arguments. First, appellant challenges the sentences imposed by the trial court for rape and attempted rape, arguing that those offenses are allied offenses of similar import and therefore must merge. Appellant further argues that because the court merged the sentences for rape and gross sexual imposition and for sexual battery and attempted sexual battery, the trial court was required to set aside the convictions for the lesser offenses (gross sexual imposition and attempted sexual battery). Instead, appellant asserts, the court allowed the convictions on all six offenses to stand.
Appellant's first argument raises the issue of whether the Double Jeopardy Clauses of the United States and Ohio Constitutions and R.C. 2941.25 prevent a court from imposing sentences for violations of both the rape and attempted rape statutes.
Initially we note that appellant's trial counsel did not argue in the proceedings below that the rape and attempted rape convictions should merge. Generally, a court of appeals will not address errors that were not raised in the court below. Statev. Williams (1977), 51 Ohio St.2d 112, vacated in part on other grounds in Williams v. Ohio (1978), 438 U.S. 911. Pursuant to Crim.R. 52(B), however, "plain errors or defects affecting substantial rights may be noticed [by the appellate court] although they were not brought to the attention of the [trial] court." "Notice of plain error under Crim.R. 52 (B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long
(1978), 53 Ohio St.2d 91, paragraph three of the syllabus. Under a plain error analysis, a trial court's judgment will not be reversed on appeal unless, "* * * but for the error, the outcome of the trial clearly would have been otherwise." Id. at paragraph two of the syllabus. We must therefore determine if the trial court's failure to merge the rape and attempted rape convictions rose to the level of plain error.
The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution protect, inter alia, against multiple punishments for the same offense. North Carolina v. Pearce (1969), 395 U.S. 711, overruled on other grounds in Alabama v. Smith (1989),490 U.S. 794; State v. Casalicchio (1991), 58 Ohio St.3d 178. In the multiple punishment context, the purpose of the Double Jeopardy Clause is to "* * * prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v.Hunter (1983), 459 U.S. 359, 366. R.C. 2941.25 is essentially a codification of the Double Jeopardy Clause and reads:
 "(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
 "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."
In State v. Rance (1999), 85 Ohio St.3d 632, 636, the Supreme Court of Ohio set forth the following test for determining whether certain offenses are allied offenses of similar import:
 "If the elements of the crimes `"correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import."' [State v. Jones (1997), 78 Ohio St.3d 12,] 13, * * * quoting Blankenship 38 Ohio St.3d at 117 * * *. If the elements do not so correspond, the offenses are of dissimilar import and the court's inquiry ends — the multiple convictions are permitted."
When applying this test, the court should contrast the statutory elements in the abstract, rather than considering the particular facts of the case. Id. "And if the elements do so correspond, the defendant may not be convicted of both unless the court finds that the defendant committed the crimes separately or with separate animus." Id. at 638-639, citing R.C. 2941.25(B) andJones, supra at 14.
In the present case, appellant was convicted of rape, in violation of R.C. 2907.02(A)(2), and attempted rape, in violation of R.C. 2907.02(A)(2) and R.C. 2923.02(A). R.C. 2907.02(A)(2) provides: "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." "Sexual conduct" is defined in R.C.2907.01(A) as:
 "* * * vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse."
R.C. 2923.02(A) proscribes an attempt to commit rape and provides: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense." Aligning the elements of appellant's offenses, it is clear that the elements of the two crimes correspond to such a degree that the commission of one (rape) will result in the commission of another (attempted rape). State v. Jones (1997),78 Ohio St.3d 12, 13. In the present case, however, we conclude that the record reveals that appellant committed the two crimes with a separate animus as to each. Appellant's attempted rape conviction was based on evidence that he attempted to penetrate Michelle's vagina with his penis. Being unable to obtain an erection, appellant then penetrated Michelle's vagina with his finger, thereby committing rape. Id. at 14. See, also,State v. Nicholas (1993), 66 Ohio St.3d 431.
Accordingly, rape and attempted rape were not allied offenses of similar import in this instance, and appellant was properly convicted of and sentenced for both.
Appellant further contends that pursuant to R.C. 2941.25(A), if crimes are of similar import, a defendant is entitled to have one conviction set aside. Accordingly, appellant argues that the trial court erred in not setting aside his convictions for gross sexual imposition and attempted sexual battery when those convictions were merged into the convictions for rape and sexual battery respectively. Again, appellant's trial counsel did not raise the issue in the proceedings below. Accordingly, we must proceed under a plain error analysis. Appellant is correct in his assertion that his convictions for gross sexual imposition and attempted sexual battery should have been set aside. R.C. 2941.25. The issue raised herein, however, is whether the court's failure to set aside those convictions amounts to plain error when the sentences were ordered to be served concurrently. The appellate courts in Ohio are split on this issue. (See Judge Carr's dissent in State v. Martin (Feb. 9, 1999), Summit App. No. 18715, unreported, for an excellent discussion of the three schools of thought on this issue.) Although the Supreme Court of Ohio has not expressly determined this issue, the court in State v. Golston (1994), 71 Ohio St.3d 224,227, did state: "Given the numerous adverse collateral consequences imposed upon convicted felons, it is clear to us that a person convicted of a felony has a substantial stake in the judgment of conviction which survives the satisfaction of judgment imposed upon him or her." In light of this language, the following excerpt from State v. Fields (1994),97 Ohio App.3d 337, 347-348, in our view best summarizes the proper treatment of this issue.
 "In Ohio, R.C. 2941.25 mandates that the court may not sentence a defendant for two allied offenses. This protection is rooted in the concept that multiple punishments for single crimes violate the Double Jeopardy Clauses of the United States and Ohio Constitutions. * * * Even in the case of concurrent sentences for allied offenses, this court has held that it is prejudicial plain error to impose multiple sentences. * * * The prejudice is a `criminal record [that] will reveal convictions for two felonies' when the defendant has committed only one criminal act." (Citations omitted.)
The court's failure to vacate appellant's convictions for gross sexual imposition and attempted sexual battery left him convicted of six felonies when he committed only four criminal acts. Accordingly, we find that the trial court's failure to vacate these convictions amounted to plain error and the first assignment of error is well-taken in part.
In his second assignment of error, appellant contends that he was denied the effective assistance of counsel in the trial below because of his counsel's failure to object to three witnesses' testimony that appellant was guilty of the offenses charged. Appellant asserts that by his trial counsel's failure to object, Maria Baker, Detective Lippert and Michael White testified as to their opinions of appellant's guilt. This evidence, appellant argues, was clearly inadmissible and his trial counsel's failure to object to it amounted to prejudicial error.
In Strickland v. Washington (1984), 466 U.S. 668, the United States Supreme Court set forth a two-part test that must be satisfied by one claiming ineffective assistance of counsel. The Supreme Court of Ohio has repeatedly followed that test, as it stated in State v. Bradley (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, as follows:
 "2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (State v. Lytle [1976], 48 Ohio St.2d 391 * * *; Strickland v. Washington [1984], 466 U.S. 668, followed.)
 "3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different."
Further, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *."Id. at 142, quoting Strickland, supra at 689. Ohio presumes a licensed attorney is competent. Vaughn v. Maxwell (1965),2 Ohio St.2d 299.
Opinion testimony by a non-expert witness is subject to the limitations set forth in Evid.R. 701. That rule provides that, to be admissible, the opinion must be: "(1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue." Moreover, opinion testimony that is otherwise admissible is not objectionable simply because it pertains to the ultimate issue in the case. Evid.R. 704.
Appellant first challenges counsel's failure to object to Maria Baker's testimony regarding her feelings for appellant. Upon redirect examination, Baker testified as follows:
"Q. You loved and trusted him?
"A. Yes, I did, with all of my heart.
"Q. When did that all stop?
"A. The day Children Services came to my house.
"Q. Why, what happened that made that all go away?
 "A. If I may explain, that day when they came to my house and they talked to Russ, they — first of all, he walked around and he sat down on the couch and he started crying, I knew right then and there he done [sic] it."
While this testimony did express an opinion on the ultimate issue, it was rationally based on Baker's own perception of the situation and was helpful to a clear understanding of her testimony regarding why she no longer loved and trusted appellant. Accordingly, we cannot say that trial counsel was ineffective for failing to object to this testimony.
Appellant next contends that his trial counsel failed to object to the improper opinion testimony of Detective Lippert. The testimony to which appellant refers occurred when Lippert was being questioned about the course of his investigation:
 "Q. Would you agree with me that there are those cases where there really is no question as to sexual conduct taking place, the question is more on the consent; and then there are those cases where the issue is whether or not conduct even occurred?
"A. That's true.
"Q. Generally if falls into one of those two categories?
"A. Correct.
 "Q. And in this particular case, what led you to believe, well, which category would this case fall into?
"A. I would have to say —
"Q. After speaking with the defendant on the 16th.
 "A. Oh, okay, after speaking with him it fell into the category of whether or not there was consent for the activity.
"Q. Why is that?
 "A. Because he made an admission to attempting to have sex with Michelle. He wasn't able to complete the act because he could not obtain an erection.
 "Q. And was his statement very similar to the victim's own statement?
"A. It was.
 "Q. And at that time, was there a need to conduct these tests, have the clothing sent to BCI, blood tests, scraping inside the fingernails, hair analysis, what kind of case are those used for?
 "A. Those are needed immediately for a case where you don't have any idea who the perpetrator is, No. 1. No. 2, she washed her clothes, which becomes useless to me, there was no indication to me that there would have been blood present, and there was no indication to me that there would have been any exchange of bodily fluid between the two based on her initial statement."
Accordingly, contrary to appellant's assertion, Lippert was not expressing an opinion on the ultimate issue of whether appellant had sexual conduct with Michelle but was explaining why his investigation took the course that it did in light of appellant's written confession. We therefore cannot say that appellant's trial counsel was ineffective for failing to object to Lippert's testimony.
Finally, appellant asserts that Michael White, the polygrapher, was permitted to opine as to why appellant made incriminating statements in his presence. Appellant cites the following as the testimony to which his trial counsel should have objected:
 "A. From my experience, I think all guilty parties want the situation that they are involved with over with. It's a great burden, it's a stressful — it's a significant emotional event in their lives, so it makes good sense that they want it over with."
To fully understand this testimony, however, it is necessary to discuss the context in which it was given. White was questioned about an Exit Interview Form that appellant completed while in White's presence. The pertinent portion of that form is quoted above, and includes appellant's statement that he told the truth because he "just wanted it over with." Appellant also stated that he was sorry for committing the crimes. Accordingly, in testifying as he did, White's opinion was rationally based on his perception of appellant's confession. We do, however, find it difficult to see how this opinion was helpful to a clear understanding of White's testimony or to a determination of a fact in issue. Nevertheless, given the remaining evidence in this case, we cannot say that but for counsel's failure to object, the result of appellant's trial would have been different.
Accordingly, the second assignment of error is not well-taken.
In his third assignment of error, appellant asserts that his convictions were against the manifest weight of the evidence. In evaluating a trial court's decision under a manifest weight standard, an appellate court sits as a "thirteenth juror" and may disagree with the fact finder's resolution of the conflicting testimony. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. The appellate court, "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
Appellant does not challenge his convictions with specificity but, rather, argues that they were all against the manifest weight of the evidence. Given our ruling under the first assignment of error vacating the convictions for gross sexual imposition and attempted sexual battery, we will confine our discussion herein to the remaining convictions.
Appellant was convicted of rape in violation of R.C.2907.02(A)(2), sexual battery in violation of R.C. 2907.03(A)(9), attempted rape in violation of R.C. 2907.02(A)(2) and R.C.2923.02(A), and intimidation in violation of R.C. 2921.04(B). The rape and attempted rape statutes have been set forth above. The sexual battery offense for which appellant was convicted provides as follows:
 "(A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
"* * *
 "(9) The other person is a minor, and the offender is the other person's athletic or other type of coach, is the other person's instructor, is the leader of a scouting troop of which the other person is a member, or is a person with temporary or occasional disciplinary control over the other person."
Finally, the intimidation offense for which appellant was convicted reads:
 "No person, knowingly and by force or by unlawful threat of harm to any person or property, shall attempt to influence, intimidate, or hinder the victim of a crime in the filing or prosecution of criminal charges or an attorney or witness involved in a criminal action or proceeding in the discharge of the duties of the attorney or witness."
Upon a review of entire record in this case, we cannot find that appellant's convictions for the four offenses enumerated were against the manifest weight of the evidence. By penetrating Michelle's vagina with his finger and purposely compelling Michelle to submit by force, appellant committed rape. By attempting to penetrate Michelle's vagina with his penis and purposely compelling Michelle to submit by force, appellant committed attempted rape. In addition, appellant was a father figure to Michelle. Accordingly, by having sexual conduct with Michelle when he was a person with temporary or occasionally disciplinary control over Michelle, appellant committed sexual battery. Finally, by warning Michelle that he would harm her and her family if she told anyone about the sexual conduct, appellant committed the crime of intimidation. Evidence in the trial below supports each of these factual findings. Appellant's third assignment of error is, therefore, not well-taken.
Because the fourth and fifth assignments of error are interrelated, we will address them together. Appellant asserts that his classification as a sexual predator pursuant to R.C. Chapter 2950 is unconstitutional in that it violates his right to privacy and constitutes double jeopardy.
It is well-established that the "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." State v. Awan (1986), 22 Ohio St.3d 120, syllabus. Appellant never raised the issue of the constitutionality of R.C. Chapter 2950 during the trial court proceedings or before or during the hearing on whether appellant was a sexual predator. Accordingly, he has waived the right to now challenge the statute before this court. Nevertheless, we note that this court has previously held that R.C. Chapter 2950 does not violate the Double Jeopardy Clause of the United States Constitution. State v. Johnson (Dec. 31, 1998), Lucas App. No. L-98-1202, unreported. While this court has not previously addressed appellant's right to privacy argument, it is noteworthy that a number of Ohio appellate courts have considered that argument and rejected it. See State v. Smith (Mar. 9, 2000), Cuyahoga App. No. 75512, unreported; State v. Frost (Mar. 8, 2000), Lorain App. No. 99CA007316, unreported; State v. Pavlick
(Dec. 20, 1999), Holmes App. No. 98-CA-002, unreported. Moreover, the appellate court decision upon which appellant relies in support of his argument, State v. Williams (Jan. 29, 1999), Lake App. No. 97-L-191, unreported, has been stayed by the Supreme Court of Ohio, see State v. Williams (1999), 85 Ohio St.3d 1403, pending that court's review upon a discretionary appeal. State v.Williams (1999), 86 Ohio St.3d 1406.
Accordingly, we find appellant's fourth and fifth assignments of error not well-taken.
The judgment of the Erie County Court of Common Pleas is affirmed in-part and reversed in-part. Pursuant to App.R. 12(B) we hereby vacate appellant's convictions for gross sexual imposition and attempted sexual battery. Court costs of this appeal are assessed to appellant.
JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 _______________________________ MARK L. PIETRYKOWSKI, J.
PETER M. HANDWORK, J., CONCUR.
JAMES R. SHERCK, J., CONCURS IN PART AND DISSENTS IN PART.